UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL J. HAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:18 CV 69 ACL |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

Plaintiff Michael J. Hagan brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Hagan's severe impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1]After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

## I. Procedural History

Hagan filed his application for benefits on October 30, 2015, claiming that he became unable to work on April 24, 2014. (Tr. 142-43.) In his Disability Report, Hagan alleged disability due to attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), and gout. (Tr. 172.) Hagan was 52 years of age on his alleged onset of disability date. (Tr. 24.) His application was denied initially. (Tr. 74-79.) Hagan's claim was denied by an ALJ on February 5, 2018. (Tr. 15-26.) On July 2, 2018, the Appeals Council denied Hagan's claim for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Hagan argues that "the decision of the ALJ is contrary to the weight of the evidence currently of record." (Doc. 20 at p. 3.)

## II. The ALJ's Determination

The ALJ first found that Hagan meets the insured status requirements of the Act through December 31, 2019. (Tr. 17.) She next found that Hagan did not engage in substantial gainful activity since April 24, 2014, his alleged onset date. *Id.* In addition, the ALJ concluded that Hagan had the following severe impairments: anxiety disorder, PTSD, and bipolar disorder. (Tr. 18.) The ALJ found that Hagan did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19.)

As to Hagan's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can perform simple, routine tasks and can have occasional interaction with supervisors, coworkers, and the public.

(Tr. 20.)

The ALJ found that Hagan was unable to perform any past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as laundry laborer, linen room attendant, and stubber. (Tr. 23-25.) The ALJ therefore concluded that Hagan was not under a disability, as defined in the Social Security Act, from April 24, 2014, through the date of the decision. (Tr. 26.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on October 30, 2015, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

*Id.*

## III.  Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations

omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974,

977 (8th Cir. 2003).

**III.B. Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary

to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is

responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1),

416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

In his single claim, Hagan states that new evidence he submitted to the Appeals Council after the ALJ's decision was "material to his medically determinable impairments during the period of disability." (Doc. 20 at p. 3.) Hagan argues that this additional evidence —a medical source statement from treating psychiatrist Autumn Clark, D.O.—demonstrates that he is disabled.

Dr. Clark completed a Medical Source Statement-Mental ("MSS") on March 31, 2018. (Tr. 8-10.) Hagan submitted the MSS to the Appeals Council, which addressed the evidence as follows:

> You submitted evidence dated March 31, 2018 from Autumn Clark, D.O. (3 pages). The Administrative Law Judge decided your case through February 5, 2018. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before February 5, 2018.

(Tr. 2.)

Where, as here, "the Appeals Council denies review of an ALJ's decision after reviewing new evidence, '[the Court does] not evaluate the Appeals Council's decision to deny review, but rather [it] determine[s] whether the record as a whole, including the new evidence, supports the ALJ's determination.'" *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (quoting *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)). *Accord Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012). The Eighth Circuit has noted that this means that the Court "must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing," which is "a peculiar task for a reviewing court." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). *Accord Van Vickle v. Astrue,* 539 F.3d 825, 828 n.2 (8th Cir. 2008). In assessing the new evidence, "medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision." *Cunningham*, 222 F.3d at 502.

In her MSS, Dr. Clark indicated that she began treating Hagan on April 19, 2017 for diagnoses of PTSD and chronic major depressive disorder. (Tr. 8.) Dr. Clark expressed the opinion that Hagan's ability to perform activities of daily living was "good"; but he was "unable to meet competitive standards" in the areas of social functioning and concentration, persistence, or pace. (Tr. 9.) Dr. Clark listed Hagan's symptoms as impaired focus and concentration, inability to focus, poor communication, irritability, poor sleep, and nightmares. *Id.* She found that Hagan's condition interferes with his ability to interact appropriately with co-workers,

supervisors, or the general public in that he is unable to tolerate conflict or changes in routine and is unable to assess risk appropriately. *Id.* When asked whether Hagan would be likely to miss one day of work per month on average due to his symptoms or two or more days a month, Dr. Clark responded "Yes." (Tr. 10.) Dr. Clark indicated that Hagan would miss work due to generalized malaise, inability to maintain focus, impaired thought processes, and impaired communication. *Id.* Dr. Hagan indicated that the limitations she found existed since 2011. *Id.*

In their denial, the Appeals Council noted that Dr. Clark's MSS does not relate to the period at issue because the ALJ decided Hagan's case through February 5, 2018 and Dr. Clark's opinion does not affect this decision. (Tr. 2.) Hagan alleges disability beginning on April 24, 2014. The relevant time period in this case, therefore, is April 24, 2014, through the ALJ's decision on February 5, 2018. Although Dr. Clark's MSS is dated almost two months after the ALJ's decision, it is based on her treatment of Hagan beginning on April 19, 2017, and purports to relate back to 2011. The Appeals Council considered this evidence, and concluded there is no reasonable probability the additional evidence would change the outcome of the decision. The undersigned agrees.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion

entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012).

The record reveals Dr. Clark treated Hagan on only three occasions. (Tr. 318-31.) On Hagan's initial visit on April 19, 2017, he reported symptoms of amotivation, hypervigilance, nightmares, depressed mood, low energy, poor concentration, problems with organization, and variable sleep. (Tr. 330.) He was having nightmares at least three times a week. *Id.* Hagan was in good mental health until 2011, at which time he was involved in the Joplin tornado. *Id.* In 2014, he was assaulted while drinking in a bar and pulled a handgun on the assaulter. *Id.* He was charged with unlawful use of a weapon as a result. *Id.* Hagan reported that he "currently works for himself." *Id.* He used to have a "high-stress job as a banker," but was unable to work at this position due to his legal issues. *Id.* Hagan was on probation due to the 2014 assault incident. *Id.* Hagan had been receiving psychiatric care from a nurse practitioner and a licensed clinical social worker, and reported that his psychotropic medications were helping him. *Id.* Upon mental status examination, Hagan was oriented to person, place, time, and situation; cooperative and engaged in the interview; exhibited appropriate eye contact, spontaneous speech, and appropriate language; his mood was anxious and depressed; his affect had a full range with normal intensity; his thought processes were logical, linear, and goal directed; his insight, judgment, and impulse control were intact; his fund of knowledge was deemed above average; and his memory was grossly intact. *Id.* Dr. Clark found that Hagan met the criteria for PTSD stemming from the Joplin tornado and the assault; and moderate major depressive disorder. *Id.* Situational factors contributed significantly to his mental health

problems. (Tr. 331.) Dr. Clark increased Hagan's medication and advised him to continue therapy. *Id.* On June 21, 2017, Hagan reported that he was doing "fair." (Tr. 324.) He had to put his dog to sleep, which was a "significant loss." *Id.* Additionally, a knee infection and legal issues were causing him stress. *Id.* Hagan was working for a resort at Lake of the Ozarks. (Tr. 325.) On examination, Hagan exhibited good eye contact, appropriate speech, his mood was anxious, his affect was appropriate, his thought process was goal-directed, he was focused, his concentration was fair, his judgment and insight were fair, and his memory was intact. (Tr. 324.) Dr. Clark adjusted Hagan's medications, and instructed him to return for follow-up in ten to twelve weeks. (Tr. 325-26.) On September 13, 2017, Dr. Clark's examination findings remained unchanged. (Tr. 318.) She again noted that Hagan was working for a resort at Lake of the Ozarks. *Id.*

Dr. Hagan's opinions are not supported by her own treatment notes. Dr. Hagan found that Hagan was unable to meet competitive standards in the areas of social functioning and concentration, yet her treatment notes do not document severe symptoms justifying these limitations. With regard to Hagan's social functioning, Dr. Clark found Hagan was cooperative and engaged in the interview, his speech and language were appropriate, his affect had a full range with normal intensity, his insight and judgment were either intact or fair, and his impulse control was intact. Significantly, on each visit, Dr. Clark remarked that Hagan was working, either "for himself" or at a lake resort. Similarly, Dr. Clark's opinion regarding Hagan's concentration deficits is inconsistent with her findings on examination that Hagan was focused; his concentration was fair; his thought processes were logical, linear, and goal directed; and his memory was intact. (Tr. 318, 324, 330.)

As Defendant notes, Dr. Clark's opinion is also internally inconsistent or incomplete. First, Dr. Clark found Hagan experienced impaired focus and concentration, poor sleep, and was unable to assess risk appropriately, yet she also found his ability to perform activities of daily living was "good." (Tr. 9.) In addition, when asked whether Hagan would miss one day of work per month on average "<u>OR</u>" two or more days of work per month on average, she responded "yes." (Tr. 10.)

Dr. Clark's opinion is also inconsistent with the other evidence of record the ALJ discussed in determining Hagan's RFC. Hagan began seeking mental health treatment in May 2014, after the April 2014 assault incident. (Tr. 21, 266.) Hagan reported that he was not able to eat or sleep due to the trauma of the assault incident. (Tr. 266.) He had not taken any prescription medication prior to the incident. (Tr. 266.) Hagan reported that he had experienced flashbacks and bad dreams since 2011, when he was in the Joplin tornado and lost material things, friends died, and he was injured physically. *Id.* Upon examination, Hagan's memory was intact, his fund of knowledge was above average, his judgment was impaired, he had no obsessive thoughts, and no hallucinations or paranoia. *Id.* Andrew Lovy, D.O. diagnosed Hagan with major depression with anxious features, and prescribed medication. (Tr. 267.) The ALJ noted that at subsequent follow-up visits, Hagan reported that his symptoms—including his concentration, depression, and flashbacks—were improving with medication. (Tr. 22, 264, 263, 261, 260.) Hagan continued to report anxiety due to his legal issues. *Id.* The ALJ pointed out that Hagan only saw his psychiatrist on two occasions in 2015. (Tr. 22, 259-62.) Hagan re-established mental health treatment in August 2016 with Satnam Mahal, M.D., having last received treatment in November 2015. (Tr. 22, 302.) Dr. Mahal noted that Hagan was working part-time doing maintenance work. (Tr. 299.) On examination, Hagan's

psychomotor activity was normal; he made good eye contact; he was cooperative, open, and reliable; his speech was normal; his reported mood was depressed and anxious; his affect was full and appropriate; his flow of thought was logical and goal directed; his insight and judgment were fair; his memory for recent and remote events was good; and his attention/concentration was poor. (Tr. 30.) Dr. Mahal recommended therapy, but Hagan declined, stating he did not need therapy. (Tr. 301.) Dr. Mahal refilled Hagan's medications. *Id.* On October 3, 2016, Hagan reported feeling under a lot of stress "because the lady he work[s] for is very controlling." (Tr. 303.) On December 22, 2016, Hagan reported that he was "feeling fine," and his mood was "fairly stable, anxiety level is tolerable." (Tr. 308.) He continued to complain about stress related to his employer. *Id.* Hagan's sleep was "ok," he had no medication side effects, and his medications were fairly effective. *Id.* On March 16, 2017, Hagan again reported that he was under a lot of stress due to his "very controlling" employer. (Tr. 313.) He indicated that his medications were fairly effective but requested an increase due to his increased anxiety and irritability. *Id.* Hagan established care with social worker Rhonda R. Germany, who referred Hagan to Dr. Clark for medication management in April 2017. (Tr. 22, 330.)

The ALJ found that Hagan received conservative treatment, consisting of outpatient mental health therapy and medications. (Tr. 22.) She also noted that he has never required psychiatric hospitalization. *Id.* Further, Hagan acknowledged to treating providers that his medications were effective. *Id.*

The ALJ also discussed the medical opinion evidence of record. The ALJ first indicated she was assigning "considerable weight" to the opinion of state agency psychological consultant Raphael Smith, Psy.D, because it was supported by the record. (Tr. 23.) Dr. Smith expressed the opinion that Hagan had mild restriction in his activities of daily living; and moderate

difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 63.) Dr. Smith found that Hagan retained the ability to understand and remember simple instructions, carry out simple work instructions, maintain adequate attendance and sustain an ordinary routine without special supervision, interact adequately with peers and supervisors in a position with limited public interaction, and adapt to most usual changes common to competitive work. (Tr. 67.)

The ALJ next stated that she was assigning "partial weight" to the opinions of consultative psychological examiner Thomas Spencer, Psy/D. (Tr. 23.) Hagan presented for a consultative examination on February 10, 2016, at which time he reported recurrent nightmares, fear of severe weather, and difficulty with sleep due to the Joplin tornado. (Tr. 291.) Hagan also complained of ongoing depression, agitation/anger, and underlying paranoia. (Tr. 294.) He indicated that he spent thirty years in the banking industry, where his paranoia and cynicism served him well as a bank executive, although he was fired from his last four jobs. *Id.* Upon examination, Hagan had no impairment in grooming or hygiene; his eye contact was poor and his speech was flat; he was cooperative and seemed to be a decent historian; his insight and judgment appeared poor; his affect was restricted; he denied thoughts of suicide and homicide; he was oriented to person, place, time, and event; he was not observed responding to internal stimuli but presented with significant paranoid ideation; his flow of thought was intact; he appeared to be of average intelligence; he demonstrated a decent working knowledge of social norms; and he had no impairment in his memory. (Tr. 293.) Dr. Spencer expressed the opinion that Hagan was capable of understanding and remembering simple instructions and engaging in and persisting with simple tasks; but had marked impairment in his ability to interact socially and

adapt to the environment. (Tr. 294.) He further found that Hagan was not capable of managing his benefits without assistance. *Id.*

The ALJ found that some of Dr. Spencer's findings were inconsistent with Hagan's reported daily activities. For example, Hagan indicated in his Function Report that he was independent in self-care, was capable of performing household chores and daily tasks, took care of his finances, and went out by himself. (Tr. 23, 182, 293.) The ALJ found that Dr. Spencer's opinion that Hagan was not capable of managing his own benefits was inconsistent with Hagan's testimony that he managed his finances. (Tr. 23, 182.)

Most significant are the repeated references in the record that Hagan was working during the relevant period despite his testimony at the hearing that he had not worked since April 2014.[2] (Tr. 23.) In August 2016, Hagan reported to Dr. Mahal that he was working part-time doing maintenance work. (Tr. 299.) On October 3, 2016, Hagan was under a lot of stress "because the lady he work[s] for is very controlling." (Tr. 303.) In December 2016 and March 2017, Hagan continued to complain about stress related to his controlling employer. (Tr. 308, 313.) In April 2017, Hagan reported to Dr. Clark that he was working "for himself." (Tr. 330.) He indicated that he was working for a resort at Lake of the Ozarks in June 2017 and September 2017. (Tr. 325, 318.) The ALJ, therefore, determined that Hagan was not as socially limited as found by Dr. Spencer.

The ALJ concluded that Hagan retained the mental RFC to perform simple, routine tasks and could have occasional interaction with supervisors, co-workers, and the public. (Tr. 20.)

---

[2]The ALJ addressed this inconsistency in her opinion. (Tr. 17-18.) She noted that Hagan's earnings record does not reflect wages or a profit from self-employment activity, which prevented a complete analysis of whether this work activity exceeded substantial gainful activity. (Tr. 18.) The ALJ ultimately concluded that further development on this issue would not serve judicial economy, as there exists a valid basis for denying Hagan's application. *Id.*

The ALJ explained that the medical evidence supports concentration difficulties that would restrict Hagan to simple tasks consistent with unskilled work; and some limitation in interaction with the public due to his history of interpersonal conflict. (Tr. 23.) The ALJ stated that no further social difficulties were supported.

RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and the claimant's description of his limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).

The ALJ's RFC determination is supported by substantial evidence on the record as a whole. It is supported by the opinion of Dr. Smith, Hagan's conservative and infrequent mental health treatment, the findings on examination of mental health professionals, and Hagan's reported ability to work after his alleged onset of disability. Dr. Clark's MSS would not have changed the ALJ's decision for the reasons discussed above.

An ALJ's decision is not to be disturbed "so long as the...decision falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact." *Nicola v. Astrue*, 480 F.3d

885, 887 (8th Cir. 2007). Although Hagan articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. *See Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (concluding that "[w]hile it was not surprising that in an administrative record which exceeds 1,500 pages, [claimant] can point to some evidence which detracts from the Commissioner's determination, good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of September, 2019.